Filed 10/22/21  In re Andrew W. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re ANDREW W. et al., Persons Coming Under the Juvenile Court Law. | B310133, B311326 (Los Angeles County Super. Ct. No. 19LJJP00792A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TYLER W., Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Robin R. Kesler, Juvenile Court Referee.  Dismissed in part and affirmed in part.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Tyler W., mother of now seven-year-old Andrew W., six-year-old Jonathon D.,[1] and three-year-old Ethan W., appeals from the juvenile court's jurisdiction findings and disposition orders declaring her children dependents of the court under Welfare and Institutions Code section 300[2] and removing them from her custody, and from orders awarding the children's respective fathers sole custody and terminating jurisdiction. The custody orders and the orders terminating jurisdiction render Tyler's appeal from the disposition orders moot. But because an error in the juvenile court's jurisdiction findings could adversely affect Tyler's custody rights, and because Tyler appealed from the custody orders and orders terminating jurisdiction, the appeal from the jurisdiction findings is not moot, although we conclude substantial evidence supported the court's findings. Because Tyler makes no substantive argument the custody orders or orders terminating jurisdiction were erroneous, apart from her

_____

[1] According to Tyler, Jonathon's name is misspelled throughout the record as "Johnathan."

[2] Statutory references are to the Welfare and Institutions Code.

2

arguments regarding the jurisdiction findings and disposition orders, we affirm the custody orders and orders terminating jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Department Receives Multiple Referrals Concerning the Family*

Beginning in 2017 the Los Angeles County Department of Children and Family Services received several reports of potential abuse or neglect involving the family.  In one instance, on July 29, 2019, a neighbor in Tyler's apartment building found Andrew and Jonathon "wandering around the complex, 'about 100 feet' from the home" without any adult supervision.[3]  The neighbor asked the children where their parents were, and Andrew said his "mother was gone."  The neighbor kept the children until law enforcement arrived.

Tyler explained that, because the children's babysitter, Reina, had not arrived when Tyler needed to leave for work, Tyler told Reina that she would lock the door to the apartment and that five-year-old Andrew would unlock the door for Reina when she arrived.  Tyler left the apartment at 6:00 p.m. and "checked-in" with Reina half an hour later.  Tyler said Reina told her the children were fine and sent her a text message with a photo of the children asleep.  Law enforcement officers "observe[d] the text messages between [Tyler] and Reina and confirm[ed] [Tyler's] statements."  Tyler and a police officer attempted to contact Reina, but Reina did not answer her phone

---

[3]     It is unclear whether Ethan was in the apartment or was staying with his father at the time.

or respond to Tyler's messages. The Department concluded the reported information did not "meet criteria for child abuse or neglect."

On September 16, 2019 someone notified the child abuse hotline that Tyler brought then 14-month-old Ethan to the hospital with second-degree burns on his left palm and fingers. Tyler told hospital staff that four days earlier Ethan was burned by "an unknown object" at his daycare center, but that the center did not provide an incident report. The burns were infected, blistered, and festering. The caller stated that Tyler's story did not make sense because a daycare center generally provides reports of injuries occurring at the center. The caller also observed that Ethan's burns looked as though they were made by a curling iron and that Ethan's two brothers were "dirty and unkempt."

After Tyler failed to return the Department's telephone calls, a social worker contacted Jonathon and Ethan's daycare center and spoke with a teacher. The teacher said that the children did not come to school dirty, but that Jonathon would come to school "with no underwear and wearing the same clothes for two days." The teacher said the children "at times" had no socks or sweaters. The teacher was aware of the burn on Ethan's hand and told the social worker that Tyler told her it was caused by a curling iron.

Andrew and Jonathon's father, Christopher D., told the Department he had not seen his children for two months because Tyler "changed the family law order" governing his visits to "no visitation." Christopher said he had "concerns" about the children living with Tyler because he observed bruises on Andrew's legs where Christopher thought Tyler had hit Andrew.

4

Christopher's mother told the Department that Andrew and Jonathon smelled and had no socks or underwear when they visited her. Andrew and Jonathon's paternal aunt said the children's hair was dirty when they visited their grandmother. Ethan's paternal grandmother also told the Department that Ethan was "dirty" and that his clothing smelled when he visited his father, Alex G. When a social worker observed the children at their respective schools, however, they appeared well groomed and properly dressed.

On October 29, 2019, while the Department was investigating the circumstances of Ethan's burn, the Department received another referral concerning an incident that occurred a few months earlier. On August 17, 2019 Tyler took Ethan to visit his father, Alex. Alex said Tyler was angry with him because he had not been returning her phone calls or text messages. Alex saw Tyler parked across the street from his house, and he went outside to get Ethan. Tyler accelerated toward Alex and "abruptly stopped her car about 4 feet from him." Tyler got out of her car and began yelling at Alex and his wife, Wendy, who was standing in the doorway.[4] Alex and Wendy went back inside the house and watched on security cameras as Tyler threw rocks at Alex's car, causing a dent, before driving away with Ethan still in her car. Alex called the police and unsuccessfully sought a restraining order against Tyler. The People charged Tyler with felony vandalism.

A social worker questioned Tyler about the incident at Alex's house. Tyler said that she never tried to hit Alex with her car and that Wendy came out of the house "wanting to fight."

---

[4] The record refers to Wendy as both Alex's wife and Alex's girlfriend, but Alex testified Wendy is his wife.

Tyler said she did not want Ethan spending time with Wendy because there was a restraining order prohibiting Wendy from having contact with Wendy's child. A family law protective order in force at the time prohibited Ethan from sleeping overnight at Alex's house because of the restraining order against Wendy. Yet Ethan had recently stayed with Alex over the weekend while Tyler went to a concert. During Tyler's meeting with the social worker, Tyler admitted Ethan burned his hand when he climbed up on a stepstool and reached for a recently unplugged curling iron. Tyler claimed she immediately took Ethan to a doctor.

The Department also obtained incident reports from Jonathon and Ethan's daycare center showing that, between June 10, 2019 and October 29, 2019, there were 17 reports of injuries sustained somewhere other than at the center. These reports included "'bad diaper rash,'" various scratches and red marks on the children's bodies, and bruises and marks on their faces. One incident report stated Jonathon showed a teacher his underwear and told the teacher "there was 'po[o]p from last night. Mommy didn't want to change me because she said I was too sick.'"

### B. *The Department Detains the Children and Files a Petition Under Section 300*

On October 30, 2019 the Department detained the children, placed Andrew and Jonathon with their paternal grandmother, and placed Ethan with his father. At the detention hearing on November 5, 2019 the juvenile court removed the children from Tyler and ordered monitored visitation. The court also ordered the Department to provide Tyler, among other things, counseling,

6

parenting classes, and a domestic violence program, as determined by a multidisciplinary assessment team.

On November 4, 2019 the Department filed a petition under section 300 alleging six counts, only two of which are at issue in this appeal.[5]  Count b-1 alleged under section 300, subdivision (b)(1), the children came within the jurisdiction of the juvenile court as a result of Tyler's "assaultive behavior" directed at Alex when she threw rocks at his car in Ethan's presence. Count b-3 alleged under section 300, subdivision (b)(1), that Tyler's failure to supervise the children allowed the children to wander around the apartment complex alone and Ethan to burn his hand and that such "failure to provide appropriate parental care and supervision . . . endanger[ed] the [children's] physical health, safety and well-being, create[d] a detrimental home environment and place[d] the children at risk of serious physical harm, damage and danger."

Following the children's detention, a social worker interviewed Tyler.  Tyler said that, after Ethan burned his hand, she ran cold water on it and treated it with a cream.  When he developed blisters two days later, she took him to the doctor and to a follow-up visit a week later.  She said, "'I did what I was supposed to do.'"  The record does not indicate whether Tyler explained why this account of the incident differed from her original explanation.

In connection with the allegation Tyler's failure to supervise the children led to them wandering around the apartment complex, Tyler said she never left the children

---

[5]     The juvenile court dismissed four counts alleged under section 300, subdivisions (a), (b), and (j).

7

unattended or unsupervised. She said that Reina had watched the children in the past without incident, that she sent a text message to Reina asking how the children were, and that Reina responded they were fine. Tyler said that, shortly after she received the text message from Reina showing the children asleep, a neighbor called Tyler to tell her Tyler's door was "'wide open'" and "nobody was home." Tyler said she had not heard from or spoken with Reina since the incident.

A contested jurisdiction hearing began on February 6, 2020. Regarding the rock-throwing incident in August 2019, Tyler testified that, because Wendy came out of the house "aggressively calling [Tyler] a bitch," Tyler "kept having to tell [Alex] . . . 'put your bitch in check.'" Tyler said that she did not "attempt to fight" Wendy, but that: "I prepared myself because she was getting aggressive and coming out of the house, so I felt like she was going to attack me." Tyler denied driving at Alex or throwing rocks at his car after he and Wendy went inside their house. Tyler testified that, from what she learned in the anger management classes she had taken so far, if such an incident ever occurred again, she would get in her car and leave. Regarding the incident where neighbors found Andrew and Jonathon wandering in the apartment complex unsupervised, Tyler testified she eventually spoke with Reina, who said she "left early because of a family emergency."

More generally, Tyler testified she received approximately three phone calls every week from Jonathon and Ethan's daycare center reporting injuries, "mostly regarding Ethan." She admitted the boys were "a handful," but she said she did not have difficulty handling them.

8

The court recessed the hearing with the intention of resuming on March 27, 2020. As a result of the COVID-19 pandemic, however, the hearing did not resume until September 4, 2020. Meanwhile, on February 25, 2020 Tyler pleaded no contest to misdemeanor vandalism in connection with the rock-throwing incident. The criminal court ordered Tyler to complete 52 weeks of domestic violence classes and 15 days of community service and to pay restitution. A few days later a Department social worker interviewed Alex's next-door neighbor who witnessed the incident. The neighbor said she saw Alex walk outside his house toward Tyler's car, which was parked across the street. Tyler "'started to drive and she accelerated the car like she was going to hit [Alex].'" Tyler stopped the car, got out, and "'start[ed] yelling at [Alex], flailing her hands in the air. She was belligerent, vulgar and she was just yelling. She was egging on [Alex's] wife, saying "come out here you bitch" and screaming at her. She was just really threatening and way out of hand. . . . [Alex] went inside the house, . . . and [Tyler] was just screaming out there. She walked over to my neighbors, she pick[ed] up these river rocks and hit[ ] his car.'" The neighbor said Tyler got back into her car and left.

On March 1, 2020 the Department learned Tyler failed to return Ethan to his father's family following a visit scheduled for 12:00 p.m. to 6:00 p.m. Under the visitation agreement, Tyler would release Ethan to Andrew and Jonathon's paternal grandmother, Mrs. D., who would deliver Ethan to his paternal grandmother, Mrs. G., because Mrs. G. had a restraining order against Tyler. Mrs. G. would then return Ethan to his father. On February 29, 2020 Mrs. G. was running late to pick up Ethan because a car accident caused more traffic than usual. Mrs. D.

9

told Tyler that Mrs. G. would be a little late and suggested Tyler leave Ethan with her, but Tyler said she would "'bring it up with Court'" and left the location of the meeting with Ethan at 6:16 p.m. Mrs. G. arrived two minutes later. The two grandmothers went to Tyler's apartment at 7:15 p.m., accompanied by deputies from the Lancaster office of the Los Angeles County Sheriff's Department. Tyler did not answer her door after several minutes of knocking and ringing the doorbell, even though her car was in the parking lot. The deputies told the grandmothers there was nothing more they (the deputies) could do.

The next day Tyler sent some sort of correspondence to the Department stating that, after Mrs. G. did not show up for Ethan, Tyler went to the Palmdale office of the Los Angeles County Sheriff's Department and showed a deputy her visitation agreement. The deputy reportedly informed Tyler she could take Ethan home because Mrs. G. did not attempt to contact Tyler or inform her that she would be late. Tyler said the deputy told her Mrs. G.'s conduct was considered "abandonment." The Department attempted to contact Tyler without success. Through Tyler's grandmother, the Department asked Tyler to bring Ethan to the Department's office, which Tyler did on March 2, 2020. Tyler said she did not hear Mrs. D. tell her that Mrs. G. was going to be late to pick up Ethan. Tyler claimed she called Alex but did not leave him a message. The Department told Tyler her future visits with Ethan would be monitored by the Department at the Department's offices.

By mid-March 2020 the pandemic forced the Department's offices to close. Tyler and the Department worked through various arrangements for monitored video and in-person visits

10

with the children. During a visit with Andrew and Jonathon in July 2020 that Tyler's mother was supposed to monitor, Tyler's mother allowed the children to spend the afternoon unmonitored at Tyler's apartment. The Department revoked the authorization of Tyler's mother to monitor visits and arranged for in-person visits with all three children at a park with a third-party monitor.

The pandemic also interfered with Tyler's services, including parenting and anger management classes. The director of Tyler's anger management classes said that his company made "homework handouts" available to all clients so "they could receive credit and still make progress," but that Tyler did not take advantage of those resources after the pandemic ended in-person classes. As of August 31, 2020, Tyler had completed 14 of 52 domestic violence classes.

C. *The Juvenile Court Sustains the Petition, Declares the Children Dependents, and Awards Custody to the Children's Fathers*

At the continued jurisdiction hearing on September 18, 2020 the juvenile court sustained counts b-1 and b-3 concerning the rock-throwing incident and the incidents where Tyler left the children unsupervised.[6] Regarding the rock-throwing incident,

---

[6]     As sustained, count b-1 alleged: "On or about 8/17/19, the children [Andrew, Jonathon, and Ethan]'s mother [Tyler] engaged in violent and assaultive behavior in that the mother threw rocks at the father [Alex], resulting in the mother striking the [father's] vehicle in the presence of the child, Ethan. The violent conduct by the mother, endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm, damage and

11

the court stated that Tyler had been convicted of vandalism (which confirmed, contrary to her denial, she threw rocks at Alex's car), that Ethan was in Tyler's car when the incident occurred, and that Tyler was "somewhat combative." Regarding Tyler's failure to adequately supervise the children, the juvenile court stated that Tyler's delay in seeking medical attention after Ethan burned his hand on a curling iron was "not really the primary focus, but [it was] part of the focus of that count." Instead, the court focused on the episode where Tyler left the children unsupervised while waiting for the babysitter to arrive. The court stated it was not "appropriate to lock up the door and leave kids of that age alone, even for a few minutes, [and] say a five-year-old is going to unlock the door."

Before the disposition hearing on December 30, 2020 the Department submitted additional reports showing Tyler continued to engage in aggressive behavior. Christopher, Andrew and Jonathon's father, reported that his neighbor's security cameras recorded Tyler near his home at 1:30 a.m. on September 1, 2020. The next morning he found the window of his

danger." Sustained count b-3 alleged: "On a prior occasion, the children [Andrew, Jonathon, and Ethan]'s mother [Tyler] failed to provide appropriate parental care and supervision for the children, resulting in the children being found w[a]ndering around an apartment complex. On or about 9/29/19, the mother failed to provide adequate supervision for the child, Ethan, resulting in the child gaining access to an electric curling iron and the child sustaining a burn on the child's hand. Such failure to provide appropriate parental care and supervision for the children, endangers the child's physical health, safety and well-being, creates a detrimental home environment and places the children at risk of serious physical harm, damage and danger."

girlfriend's car "had been vandalized." Christopher said his girlfriend already had a restraining order against Tyler because Tyler previously broke the same window of the car. Tyler claimed that she was at work in Bakersfield until 12:30 a.m. and that she could not have been at Christopher's house by 1:30 a.m. The Department could not confirm Tyler's work schedule with a supervisor.

On October 6, 2020 Mrs. D. called the Department to report that Christopher received a call from a hospital where Jonathon was scheduled to have surgery. The caller told Christopher that Tyler had called, yelled at the receptionist to cancel the surgery, and threatened to sue the hospital. Tyler denied the incident occurred. The Department also reported that Tyler had attended 21 of 52 domestic violence classes, 21 of 26 anger management classes, and nine of 26 parenting classes.

At the March 30, 2020 disposition hearing the juvenile court found that Tyler failed to participate in or complete domestic violence and anger management classes and that she generally had gained little insight into her behavior. The court stated it was unclear whether Tyler would ever "be able to acknowledge her part in why these kids are before me" without "substantial individual counseling." The court declared the children dependents of the court and found by clear and convincing evidence it was necessary to remove the children from Tyler's custody because there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if left in her custody and there were no reasonable means to protect them without removing them from her care and custody. Based on Tyler's past behavior, the court stated, Tyler did not have the ability to coparent at that time.

13

The court awarded sole legal and physical custody to the children's fathers and continued Tyler's monitored visitation and domestic violence and anger management classes. Tyler timely appealed.

D. *The Juvenile Court Issues Custody Orders and Terminates Jurisdiction*

On January 15, 2021 the juvenile court received, signed, and filed a juvenile custody order for each child. Finding the conditions that justified jurisdiction under section 300 no longer existed, the court terminated jurisdiction. On January 21, 2021 the court amended the custody orders for Andrew and Jonathon. Tyler timely appealed.[7] We ordered Tyler's appeal from the disposition orders to be considered with her appeal from the custody orders and orders terminating jurisdiction for purposes of oral argument and decision.

---

[7] The notices of appeal identify the findings and orders appealed from as "Dispositional Findings," but they list the dates the court filed the juvenile custody orders and the orders terminating jurisdiction. "A notice of appeal shall be "'liberally construed so as to protect the right of appeal if it is *reasonably clear* what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced."'" (*In re J.F.* (2019) 39 Cal.App.5th 70, 75; see *In re Joshua S.* (2007) 41 Cal.4th 261, 272.) It is reasonably clear Tyler intended to appeal from the custody orders and the orders terminating jurisdiction, and the Department does not argue it was misled or prejudiced by the apparent typographical errors in the notices of appeal.

14

**DISCUSSION**

A. *Tyler's Appeal from the Jurisdiction Findings Is Not Moot, But Her Appeal from the Disposition Orders Is*

Tyler acknowledges that "an order terminating juvenile court jurisdiction generally renders an appeal from a previous order moot." (See *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163 (*Rashad D.*); *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) She argues, however, her appeal from the jurisdiction findings and disposition orders is not moot because she also appealed from the orders terminating jurisdiction and modifying her custody and she seeks to have the custody orders reversed. Tyler is half right.

An appeal is moot if the reviewing court cannot grant effective relief. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054; see *In re N.S.* (2016) 245 Cal.App.4th 53, 60 ["the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].) But where, as here, the parent appeals from the order terminating jurisdiction and the custody order, an appeal from jurisdiction findings is not moot where the sustained findings have an adverse effect on a parent's custody or visitation rights. (See *Rashad D.*, *supra*, 63 Cal.App.5th at p. 159 ["the parent must appeal not only from the jurisdiction finding . . . order but also from the orders terminating jurisdiction and modifying the parent's prior custody status"].) Thus, the juvenile court's order terminating jurisdiction did not moot Tyler's appeal from the jurisdiction findings because the court issued a custody order adverse to Tyler based on those findings, and Tyler appealed from the custody orders and orders terminating

15

jurisdiction. (See *Rashad D.*, at p. 164.) We can provide Tyler effective relief in these circumstances because, if we reverse the order terminating dependency jurisdiction, the juvenile court will have jurisdiction "to conduct further hearings in the now-closed case, including modification of its custody order." (*Ibid.*)

A juvenile court's custody and visitation order (commonly known as an "exit order"),[8] however, supersedes disposition orders. (See *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1165 ["the exit order 'shall be a final judgment and shall remain in effect after [the juvenile court's] jurisdiction is terminated'"]; see also § 362.4, subd. (b) [custody and visitation orders "continue until modified or terminated by a subsequent order of the superior court"].) The disposition order no longer adversely affects Tyler, and nothing we could do in this appeal can grant her any relief from an order that essentially no longer exists.[9] (See *In re E.T.* (2013) 217 Cal.App.4th 426, 436 ["[a]n appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to

---

[8] Section 362.4, subdivision (a), provides that, if a juvenile court terminates jurisdiction over a dependent child, the court may issue "an order determining the custody of, or visitation with, the child." Section 362.4, subdivision (c), provides: "If no action is filed or pending relating to the custody of the minor in the superior court of any county, the juvenile court order may be used as the sole basis for opening a file in the superior court . . . ." "Custody and visitation orders issued under section 362.4 are sometimes referred to as 'family law' orders or 'exit' orders." (*In re Ryan K.* (2012) 207 Cal.App.4th 591, 594, fn. 5.)

[9] The only aspects of the disposition orders Tyler challenges are those removing the children from her custody.

grant effective relief"].)  Tyler's appeal from the disposition order is moot.

> B.    *Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings*

> 1.    *Applicable Law and Standard of Review*

"At the first stage of dependency proceedings, the juvenile court determines whether [a] child is subject to juvenile court jurisdiction; [the Department] has the burden to prove jurisdiction by a preponderance of the evidence."  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)  Section 300, subdivision (b)(1), provides for juvenile court jurisdiction when a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [the] parent . . . to adequately supervise or protect the child, or . . . to provide regular care for the child due to the parent's or guardian's mental illness . . . ."  A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove (1) the parent's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re R.T.* (2017) 3 Cal.5th 622, 624; *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21-22.)

"A dependency court is not required to 'wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child'" (*In re J.M.* (2019) 40 Cal.App.5th 913, 921; see *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383), but "'the question under section 300 is whether

17

circumstances *at the time of the hearing* subject the minor to the defined risk of harm'" (*In re Ma.V.*, *supra*, 64 Cal.App.5th at p. 23). The court may consider past events in deciding whether a child currently needs the court's protection. (*In re J.N.* (2021) 62 Cal.App.5th 767, 775; see *In re Ma.V.*, at p. 23; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216.) "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.'" (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146; see *In re Ma.V.*, at p. 23 [there must be some reason to believe acts creating a risk of harm to the child may continue in the future]; *In re J.N.*, at p. 775 [there must be "a nexus between the parent's past conduct and the current risk of harm"].)

'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) Thus, we can affirm the juvenile court's jurisdiction findings if substantial evidence supported count b-1 or b-3.

We review challenges to the sufficiency of the evidence underlying jurisdiction findings for substantial evidence. (*In re Ma.V.*, *supra*, 64 Cal.App.5th at p. 22.) ""In making this determination, we draw all reasonable inferences from the

18

evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see *In re Caden C.* (2021) 11 Cal.5th 614, 640 ["In reviewing factual determinations for substantial evidence, . . . [t]he determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'"]; *In re Israel T.* (2018) 30 Cal.App.5th 47, 51 ["On appeal, '"we must uphold the court's [jurisdiction] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings."'"].)

"'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'" (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 848.) "'But substantial evidence "is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal."'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) ""'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence."'" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420; see *In re Ma.V.*, *supra*, 64 Cal.App.5th

at p. 22 ["Substantial evidence indicates more than a smidgeon or trace; it must be meaningful and significant and cannot be merely speculative."]; *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093 [a "juvenile court's conclusion 'supported by little more than speculation' [is] not based on substantial evidence"].) The appellant has the burden to show there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

### 2. *Substantial Evidence Supported the Juvenile Court's Findings Under Count b-3*

Tyler argues substantial evidence did not support the juvenile court's findings under count b-3 that she failed to adequately supervise the children. Most of Tyler's arguments concern the incident in which neighbors found Andrew and Jonathon wandering unsupervised around the apartment complex. Reviewing the evidence in the record in its entirety, including reasonable inferences from the evidence, we conclude substantial evidence supported the juvenile court's jurisdiction finding under count b-3.

Tyler first argues there was no evidence she was responsible for the lack of supervision. "Specifically," she argues, her "actions did not cause the minors to sneak out of the home and wander around the apartment complex. Rather, that was directly attributable to the negligent conduct of [the babysitter] . . . ." But as the juvenile court found, Tyler admittedly left three very young children alone in the apartment. All three children were of "'tender years'" for whom "'the absence of adequate supervision and care poses an inherent risk to their physical health and safety.'" (*In re Drake M.*, *supra*, 211 Cal.App.4th at

20

p. 767; accord, *In re Natalie A.* (2015) 243 Cal.App.4th 178, 186.) That risk was obvious given the burn to Ethan's hand, which occurred when Tyler's back was turned only momentarily, and the children's admitted rambunctiousness, which resulted in multiple injuries observed by daycare center employees. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 602 ["With impulsive urges and without much judgment about what could go wrong, children need supervision."].) Although nothing in the record indicates for certain how long the children were alone before the babysitter arrived, it was long enough for the children to injure themselves or each other.

Next, Tyler argues that, because the Department initially determined the incident did not meet the criteria for child abuse or neglect, evidence of the incident cannot support the juvenile court's jurisdiction. But "'[f]acts supporting allegations that a child is one described by section 300 are cumulative.'" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; see *In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1050.) Thus, "[w]hile a given quantum of evidence at a particular point in time may not support jurisdiction, those same facts considered together with new evidence may compel the court's intervention." (*In re Hadley B.*, at p. 1050.) The Department's initial assessment of a single incident did not preclude the juvenile court from exercising jurisdiction based on that incident in light of additional circumstances.

Tyler also argues the court erred by finding jurisdiction based on an allegation that was not alleged in the petition, specifically, that she left her children alone while waiting for the babysitter to arrive. Tyler accurately points out that count b-3 alleged jurisdiction based on Tyler's failure to supervise the

21

children, "resulting in the children being found w[a]ndering around [the] apartment complex," not specifically leaving her three young children alone at home. But Tyler did not object on this ground at the jurisdiction hearing, thus forfeiting the argument on appeal. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1640 [had the mother raised her objection to the sufficiency of the petition at the jurisdiction hearing, the court could have allowed the child protective agency to amend the petition to conform to the proof offered at the hearing]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 ["when a parent had the opportunity to present [a defect in notice] to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal"]; see also *In re A.A.* (2012) 203 Cal.App.4th 597, 606 [by failing to object at the disposition hearing, mother forfeited argument that the juvenile court violated her constitutional rights by failing to consider placing her children with her].)

And while the forfeiture rule does not apply "if 'due process forbids it'" (*In re T.G.* (2015) 242 Cal.App.4th 976, 985; see *In re A.A.* (2016) 243 Cal.App.4th 1220, 1238), the juvenile court did not violate Tyler's rights to due process by sustaining count b-3 based in part on Tyler's decision to leave her children home alone until the babysitter arrived. A "'parent whose child may be found subject to the dependency jurisdiction of the court enjoys a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, in order that he or she may make an informed decision whether to appear and contest the allegations.' [Citation.] 'Notice of the specific facts upon which the petition is based is necessary to enable the parties to properly meet the

22

charges.'" (*In re I.S.* (2021) 67 Cal.App.5th 918, 927; see *In re Wilford J., supra,* 131 Cal.App.4th at p. 751.) But the juvenile court violates a parent's due process right only when the court's jurisdiction findings are based on facts or a legal theory "not at issue in the original petition." (*In re G.B.* (2018) 28 Cal.App.5th 475, 478; see *ibid.* [juvenile court "erred in establishing jurisdiction based on a factual and legal theory not raised in the original petition"]; see also *In re I.S.,* at p. 927 [juvenile court may amend a petition to conform to proof on its own motion without violating the due process rights of parents so long as amendments are not material and do not mislead a party to his or her prejudice]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041-1042 [amendments to conform a dependency petition to proof do not violate due process where the amendments incorporate the same "basic allegation" as the original allegation].)

There was no material difference between (1) the allegation Tyler's failure to adequately supervise her children resulted in them wandering around the apartment complex without supervision, which created a risk of serious physical harm, and (2) the allegation Tyler's failure to adequately supervise her children resulted in them being left alone in the apartment, which created a risk of serious physical harm. While the intervening acts of the late babysitter may have contributed to Andrew and Jonathon leaving the apartment, Andrew just as easily could have unlocked the door (as Tyler knew he was capable of doing) and left the apartment before the babysitter arrived. The babysitter's subsequent arrival did not negate the risk to the children Tyler created by leaving them alone. (See *In re K.B., supra,* 59 Cal.App.5th at p. 602 ["Children are

23

immature, inquisitive, clever about escaping, and inexperienced with life's hazards."].)  The juvenile court did not violate Tyler's due process right to notice of the facts on which the petition was based because "the gravamen of the dependency petition remained the same" (*In re I.S.*, *supra*, 67 Cal.App.5th at p. 928) as the proof offered at the jurisdiction hearing.

Finally, Tyler argues there was no substantial evidence this "isolated and unfortunate" incident was likely to recur because she asked the daycare to remove her children from Reina's class, there was no prior history of this type of occurrence, and Tyler was not charged with any crime as a result of the incident.  But the juvenile court held Tyler accountable for her conduct, not Reina's, and the district attorney's failure to charge Tyler with a crime does not mean the incident cannot support a finding under section 300, subdivision (b)(1).  (See *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 563 ["failure to convict a parent of spousal abuse in a criminal proceeding . . . does not establish that the parent did not commit spousal abuse for purposes of a proceeding . . . in dependency cases"].)

Moreover, there was considerable additional evidence from which the juvenile court reasonably could have concluded Tyler's inadequate supervision created a current risk of future physical harm.  For example, there was the incident where Ethan burned his hand when left unsupervised, 17 reports of injuries the children sustained not at the daycare center in just over four months, reports the boys were unclean or did not have appropriate clothing, and the incident where Tyler went to a concert and left Ethan overnight with Alex's wife in violation of a family law order.  And although the juvenile court did not explicitly find Tyler was not credible, the court reasonably could

24

have concluded Tyler would not be truthful about any future concerns based on her inconsistent versions of, and lack of cooperation following, the curling iron incident, the rock-throwing incident, and the incident in early March 2020 where Tyler failed to return Ethan after a visit. Each of these incidents, standing alone, may not have been sufficient to show a substantial risk the children would suffer serious physical harm as a result of Tyler's failure or inability to adequately supervise or protect them. But considered together, they demonstrated the ongoing risk of serious physical harm to the children under Tyler's supervision.[10]

C. *Tyler Has Not Shown the Juvenile Court Abused Its Discretion in Terminating Jurisdiction and Issuing the Custody Orders*

Tyler states she "raises no substantive issues related to the orders issuing the exit orders and terminating jurisdiction." She asks only that we reverse the custody orders "if this Court agrees" the juvenile court's jurisdiction findings and removal order at disposition were not supported by substantial evidence. We do not agree (that the findings were not supported). Because we conclude substantial evidence supported the juvenile court's jurisdiction findings, and because her appeal from the disposition order is moot, Tyler has failed to show the juvenile court abused

_____

[10] Tyler argues there was no risk of future harm to the children at the time of the jurisdiction hearing because she had "set barriers around the doors, by the doors, and bathrooms" and "had alarms on her front door . . . where the minors couldn't go in and out." These efforts (evidence of which Tyler presented at the disposition hearing, not at or prior to the jurisdiction hearing), while commendable, did not prevent Tyler from leaving her children unattended or with inappropriate adults.

its discretion (see *In re M.R.* (2017) 7 Cal.App.5th 886, 902; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300) in terminating jurisdiction and issuing the custody orders.

## DISPOSITION

The appeal from the disposition orders is dismissed.  The jurisdiction findings, custody orders, and orders terminating jurisdiction are affirmed.


SEGAL, J.


We concur:



PERLUSS, P. J.



FEUER, J.